**SO ORDERED.**

**SIGNED this 02 day of March, 2007.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:
**WILLIAM JACK KECK,**                                    **Case No. 05-43269**
                                                          **Chapter 7**
                     **Debtor.**
_____
**FELICIA S. TURNER,**
**UNITED STATES TRUSTEE,**[1]

             **Plaintiff,**

**v.**                                                    **Adversary No. 05-7149**

**WILLIAM JACK KECK,**

                **Defendant.**

_____

## MEMORANDUM ORDER AND OPINION

---

[1]Although this action was commenced in the name of Mary May, United States Trustee, pursuant to Fed. R. Bankr. P. 7025 (incorporating Fed. R. Civ. P. 25(c)), this Court automatically substitutes Ms. May's successor as Plaintiff.

This matter is before the Court on the objection to Debtor's homestead exemption[2] filed by Patricia Hamilton, the Chapter 7 panel trustee ("Trustee"), and an objection to discharge filed by Plaintiff, Felicia S. Turner, the United States Trustee ("UST"). The parties stipulate that this matter constitutes a core proceeding,[3] and the Court has jurisdiction to decide it.[4]

The Court has conducted an evidentiary hearing on these matters and is now prepared to rule.

## I.    FINDINGS OF FACT

The Court makes the following findings of fact based upon the stipulations contained in the Pretrial Order[5] and the evidence presented at trial. Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on September 26, 2005. He signed the bankruptcy petition, schedules and statement of financial affairs (hereafter SOFA) under penalty of perjury prior to filing them with the Bankruptcy Court. Debtor appeared with counsel at the first meeting of creditors on October 24, 2005, where he unequivocally testified, under oath, that the information contained in his bankruptcy schedules and his SOFA was based upon his "own personal knowledge," that he had read all the documents

---

[2]Doc. 7 in Case No. 05-43269.

[3]28 U.S.C. § 157(b)(2)(B) & (J).

[4]28 U.S.C. § 1334.

[5]Doc. 26 in Adversary Proceeding, Case No. 05-7149.

before he signed them, and that he could think of no "additions or corrections that should be listed."[6]

Debtor's schedules and SOFA reflect the following:

1.     His homestead is valued at $90,000 with no secured or tax claims against it;

2.     He has no secured or priority debt; the only debt listed on his schedules is $66,140 in unsecured debt owed to four different credit card companies on seven different accounts;

3.     He had one checking account, a joint account held with his non-filing spouse, Marlene Keck, at Capital Federal Savings and Loan valued at $25.00;

4.     He had made no transfers or gifts, nor had he suffered any losses, in the year preceding his bankruptcy;

5.     He is retired, with Social Security providing his only source of income;

6.     He stated he had no other income during the two years immediately preceding the commencement of the case;

7.     He stated he did not close any financial accounts within one year immediately preceding the commencement of the case.

Although this is what Debtor's sworn schedules and statement disclosed, the actual facts differ in many material respects. First, his federal tax returns for the tax years 2003, 2004 and 2005 showed other income, that was not reported on the SOFA, in the amounts of

---

[6]Exhibit 2, p. 4.

$173,076, $11,982 and $19,100, respectively. Most of this income was the result of extensive gambling by Debtor and his wife. The tax returns also show gambling losses that meet, or exceed, the income reported. Debtor also failed to disclose the gambling losses on his SOFA. He further failed to disclose $753.71 as income from the sale of Westar stock in 2005.

Debtor also failed to disclose the existence of financial accounts that were closed within one year of the commencement of his bankruptcy case. He held a joint share account and a certificate of deposit at Kansas Super Chief Credit Union. Within one year of filing bankruptcy, the balance of the Super Chief Credit Union CD reached $30,509.64, hardly an insignificant amount. Between January 1, 2005 and March 28, 2005, Debtor made a series of withdrawals from that Super Chief Credit Union account and CD ranging from $1,000 to $8,000. The account and CD was closed on March 28, 2005, only six months before the bankruptcy was filed.

In addition to the Kansas Super Chief Credit Union account, Debtor also failed to disclose a joint checking account at Kaw Valley State Bank and Trust Company. On January 24, 2005, the Debtor deposited an $8,200 check into this account. The check was a "convenience check" from an MBNA credit card account. On February 24, 2005, Marlene Keck issued a $5,500 check from this Kaw Valley account payable to Debtor. That same day, the Debtor made a $5,500 payment on a loan he owed to Capital Federal, which loan was secured by a home equity mortgage on his home. The record does not disclose whether

4

that Kaw Valley account is still open, but it is clear that it was open within one year of the filing of the bankruptcy petition. Nevertheless, Debtor failed to disclose it.

Debtor's SOFA also states, in response to Question 10 regarding transfers outside of the normal course of business within a year of filing, that he had none. At his first meeting of creditors, however, he admitted that he had paid off the home equity line of credit at Capital Federal in a lump sum within that year. The Trustee noted the omission, and suggested Debtor needed to amend his SOFA. He never amended it for the purpose of correcting that error, or any of the multiple other errors in that document.

Debtor also made inaccurate oral statements at his first meeting of creditors. First, he testified that he had in fact read the schedules and SOFA before he signed them and that the information contained in them was based on his own personal knowledge. In contrast, during the evidentiary hearing, Debtor unequivocally denied having completed or read the SOFA. He testified that his wife had physically completed the SOFA, that he had received a phone call from a family member as he was sitting down to read them, and that he remembers that when he returned, he signed the papers without reading them at all. Although he remembered this during the trial, he apparently had not remembered this "fact" when he answered questions on that subject from the Trustee at his first meeting.

Debtor also failed to disclose at that first meeting the existence of the Kaw Valley bank account, the existence of the Kansas Super Chief Credit Union account or CD, or the substantial income and losses he experienced due to his gambling. He was specifically asked at that meeting, by the Trustee, if the information contained within the schedules he

previously signed under oath were, in fact, true then and still true, and he testified they were.

Another financial account is very material to this case. On May 22, 2003, Debtor and his wife opened a line of credit at Capital Federal with a $30,000 credit limit. The loan was secured by a mortgage on Debtor's home, on which only a $13,000 mortgage existed. On August 15, 2004—within a year of bankruptcy---the balance due on this line of credit was $18,469.46. Between August 15, 2004 and March 15, 2005 the Debtor made a series of large payments on, and cash withdrawals from, this line of credit. On March 15, 2005, and approximately six months before Debtor filed his bankruptcy petition, Debtor owed $16,076.64 on this line of credit. A month later, the debt had been paid down to $4,927.71. Ultimately, Debtor paid it off entirely and closed the account on April 19, 2005. Notwithstanding these facts, Debtor responded "No" to question 11 of his SOFA, which requires disclosure of any financial account closed within the year prior to filing bankruptcy.

Debtor's Schedule A reflected that he owned his home free of any debt. When asked at his § 341 meeting where he had obtained the money to pay off the mortgage on his home, Debtor testified that he used funds from his credit cards; he made no mention that he had done so with gambling winnings. At trial—over 15 months later in time and further away from the incidents in question, however, Debtor testified he was unsure whether the funds used to pay off the line of credit were derived from gambling winnings or from cash advances received from his various credit cards or from some other source.

The UST initiated this adversary proceeding seeking a denial of Debtor's discharge on three grounds. The Trustee's first allegation is that within one year of filing for

6

bankruptcy protection, Debtor transferred property of the estate with the intent to hinder, delay or defraud a creditor, which should result in a denial of his discharge under 11 U.S.C. § 727(a)(2)(A).[7] The basis for this claim is that he incurred substantial unsecured debt by taking cash advances from his credit cards and converting that money to pay off the debt securing his homestead, which real estate he then tried to exempt.

The UST next claims that Debtor knowingly and fraudulently made a false oath or account in connection with his bankruptcy case, which should result in a denial of his discharge under § 727(a)(4)(A). The basis for this claim is the numerous inaccurate statements Debtor made in his SOFA, along with the false statements made at his first meeting of creditors held October 24, 2005.

Finally, the UST claims that Debtor failed to satisfactorily explain the loss of assets that would have belonged to the bankruptcy estate, which should result in a denial of discharge under § 727(a)(5). The assets to which the UST refers are the amounts received from cash advances from the seven credit cards.

The Trustee also filed an objection to Debtor's homestead exemption. She contends that Debtor disposed of non-exempt property (cash advances) to increase the value of his exempt homestead, with the intent to hinder, delay or defraud creditors, and that § 522(o)(4) prevents Debtor from exempting that portion of the value of his homestead attributable to the

---

[7]This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (hereafter BAPCPA) became effective. All statutory references are to the Bankruptcy Code, 11 U.S.C.A. §§ 101 - 1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr. P. (2004), unless otherwise specified. One notable exception to the October 17, 2005 effective date relates to 11 U.S.C. § 522(o)(4), which became effective on April 20, 2005. New § 522(o)(4) is thus applicable to this case.

disposition of such non-exempt property. The Trustee contends that the value of the cash advances used to pay off the line of credit secured by a mortgage on Debtor's home, along with the cash advances in the amounts of $5,878.61 and $4,885 he used to pay for a new driveway and patio at his home within six months of filing his bankruptcy, should be deducted from the amount of the exemption Debtor may claim. The Trustee also requests this Court place an equitable lien against the homestead for the benefit of the estate.

Additional facts will be discussed below, when necessary.

## II. CONCLUSIONS OF LAW

### A. Denial of Discharge under § 727

The UST is seeking an order denying Debtor's discharge pursuant to § 727(a)(2)(A), (a)(4)(A), and (a)(5).

#### 1. The UST's § 727(a)(2)(A) claim

In order to succeed on his claim that Debtor's discharged should be denied under § 727(a)(2)(A), the UST must show that (1) Debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.[8] The UST bears the burden of proving each element by a preponderance of the evidence.[9]

Based upon the evidence presented, the first three elements have clearly been met and, in fact, appear to be uncontested. Debtor obtained numerous and large cash advances from

---

[8]*Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

[9]*Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611-12 (10th Cir. BAP 2001).

his credit cards at a time when he had no ability to repay them, and the proceeds from those advances would have constituted property of the estate but for the transfers. Further, within one year of filing the bankruptcy, Debtor transferred some of that property to pay off the secured line of credit on his homestead, and to improve his home. The only remaining issue, therefore, is whether such transfers were done with the intent to hinder, delay or defraud a creditor.

A denial of discharge under § 727(a)(2)(A) requires a showing of "*actual* intent to defraud creditors."[10] The desire to convert assets into exempt forms, by itself, does not rise to the level of actual intent to defraud.[11] Extrinsic evidence of fraudulent intent is required to establish fraud. Fraudulent intent can seldom be proven by direct testimony,[12] because few debtors would likely admit to fraudulent intent. Courts must, therefore, deduce whether fraudulent intent exists from all the facts and circumstances of the case, and through the use of circumstantial evidence or by inferences drawn from a course of conduct.

Courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 727(a)(2)(A).[13] However, when analyzing a case in

---

[10] *Marine Midland Business Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991) (emphasis in original).

[11] *In re Warren,* 350 B.R. 628 (10th Cir. BAP 2006).

[12] *See Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[13] Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, that the debtor obtained credit in order to purchase exempt property, that the conversion occurred after entry of a large judgment against the debtor, that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and that the conversion rendered the debtor insolvent. *Cadle Company v. Stewart (In re*

light of these badges of fraud, the Court must be mindful that the cases are peculiarly fact specific, and the conduct in each case must be viewed individually. Some of the indicia of fraud that are applicable in this case include the monetary value of the assets converted, the conversion of assets shortly before filing for bankruptcy, the fact Debtor concealed the pre-bankruptcy conversions from his creditors and the Trustee when he failed to accurately complete his SOFA in a fashion that would have disclosed the conversion of assets, and obtaining credit in order to, in effect, purchase exempt property.

The Court finds that Debtor's actions—especially when coupled with the tenor of his live testimony---do show a deliberate course of conduct, at a time when he was insolvent, with an intent to hinder, delay and defraud creditors. The evidence shows that Debtor took substantial and repeated cash advances from his credit cards within the year prior to filing for bankruptcy. He testified that he made regular payments on his credit cards until June of 2005 (three months before filing bankruptcy)—at least the minimum payment so he would be in good standing when he made requests for cash advances. He further testified he knew that he had to be in good standing to get those cash advances.

The Court does not find it coincidental that he stopped getting cash advances from credit cards after he paid off his home equity line of credit, or that he stopped paying the minimum amount on those credit cards when the home equity line of credit was closed. Some of these funds were used to directly make improvements to his house (such as the new

_Stewart_, 263 B.R. at 611.

driveway and patio) and some were used to directly pay off the line of credit secured by the mortgage on his home—which home would typically be out of the reach of creditors.

The evidence showed that most of the time Debtor would take large cash advances to ostensibly use for gambling, and had Debtor stopped there, a denial of discharge might not have been warranted. After using some or all of the funds for gambling, however, Debtor would then take the funds he either won, or had left over after gambling, if any, and pay down his secured line of credit.

There was no evidence presented that Debtor ever used gambling winnings, or leftover money after he gambled, to repay any credit card bills, once this scheme started. Furthermore, there was no evidence he would simply retain any unused cash advances for future gambling trips. Instead, Debtor used the cash advances to pay down and then off his line of credit, as well as to increase the value of his home, and then took out another large cash advance from the same (or another) credit card for future gambling. Although not a classic case of taking cash advances to pay off debt secured by an exempt asset, the Court finds that Debtor clearly intended to use cash advances from his credit cards to pay off the line of credit secured by his home. Given the close proximity of these cash advances to the filing of the bankruptcy, combined with the fact that Debtor was living on a fixed income funded by modest Social Security income and clearly had no means to repay the large credit card debt he was quickly incurring, the Court finds that Debtor's actions were done with the intent to hinder, delay, and defraud his creditors.

11

The Court's finding is buttressed by Debtor's demeanor at trial, including testimony that simply did not ring true to this factfinder. First, he claimed an amazing lack of memory about core facts in the case when the two trustees were asking questions, but suddenly acquired "better" memory when his own counsel asked questions. One example of a seemingly innocuous question was whether he had gambled in the recent past. He claimed not to remember. The Trustee then asked whether he had gambled in the last few months of 2006; he contended he did not remember. The Trustee then asked if he had gambled in 2007; he again said he could not remember. This might seem significant if the trial had been later in the year, but it was held only seventeen days into the new year, on January 17, 2007. The Court was left to wonder if he would be evasive about that question, which was really fairly immaterial to the issues, whether any of his answers were truthful.

The Court is also mindful of the inconsistent answers Debtor had given on his schedules and SOFA, as compared with his live answers to the accuracy of those statements when asked by the Trustee at the § 341 meeting, and in contrast to the answers he gave to the same questions at trial, all as set out in more detail, below. What became abundantly clear is that Debtor evidenced no discomfort with giving absolutely inconsistent responses under oath. The Court is admittedly influenced by its overall sense that this Debtor does not consistently tell the truth.

### 2. The UST's § 727(a)(4)(A) claim

The UST next seeks denial of Debtor's discharge under § 727(a)(4)(A). That statute provides, in part, that "[t]he court shall grant the debtor a discharge, unless . . . the debtor

12

knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[14] The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely on that information to be true; neither the trustee nor creditors should have to independently investigate the facts to verify their accuracy.[15] The trustee and the creditors are entitled to honest and accurate "signposts on the trail" showing what property passed through the debtor's hands during the period prior to bankruptcy.[16]

The plaintiff has the burden to prove that the debtor knowingly and fraudulently made an oath, and that the oath related to a material fact.[17] He must show that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy in a material way.[18] Plaintiff must prove each one of these elements by a preponderance of the evidence.[19]

---

[14] 11 U.S.C. § 727(a)(4)(A).

[15] *Job v. Calder (In re Calder),* 907 F.2d 953, 956 (10th Cir.1990) (holding creditors are not compelled to conduct an extensive investigation of a debtor's assets and transactions, but rather may rely upon the information provided in the bankruptcy pleadings and schedules).

[16] *Job v. Calder (In re Calder)*, 93 B.R. 734, 737 (Bankr. D. Utah 1988).

[17] Fed. R. Bankr. P. 4005; *Job v. Calder (In re Calder),* 907 F.2d at 955 (*citing* 4 Collier on Bankruptcy ¶ 727.04[1] at 727-54 to -57 (15th ed. 1987)); *see also In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997) (holding that creditor must show that debtor knowingly and fraudulently made an oath that relates to a material fact).

[18] *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000); *In re Brown*, 108 F.3d at 1294.

[19] *In re Serafini*, 938 F.2d 1156 (10th Cir. 1991) (holding proper standard of proof in a § 727(a)(4)(A) proceeding is proof by a preponderance of the evidence rather than by clear and convincing evidence).

13

It is clear that a debtor's signature on a bankruptcy petition, schedules of assets and liabilities and the SOFA, under penalty of perjury, are written declarations that have the force and effect of oaths.[20] Thus, a false statement or omission within a debtor's schedules may qualify as a false oath under § 727(a)(4)(A).[21] Intent may be inferred, and reckless indifference to the truth may rise to the level of fraudulent intent.[22] Discharge will not be denied, however, when a false statement is due to mere mistake or inadvertence.[23] Honest errors that are corrected will not jeopardize a debtor's discharge.[24]

A false oath is "material," if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.[25] Although a debtor cannot excise a false oath by making subsequent corrections to his bankruptcy petition, if the estate would have no interest in the property that was omitted, then the omission should not justify a denial of discharge.[26] However, even assets of little or no value may give rise to a denial of discharge if the

---

[20]*See* Fed. R. Bankr. P. 1008 (All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746).

[21]6 Collier on Bankruptcy ¶ 727.04[1][c], 727-41 to 727–42 (15th rev. ed. 2001).

[22]*Id.* at ¶ 727.04[1][a], 727-40.

[23]*In re Butler*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984).

[24]*In re Brown*, 108 F.3d at 1294 (citing *In re Magnuson*, 113 B.R. 555, 559 (Bankr. D. N.D. 1989) (holding honest error or mere inaccuracy not proper basis for denial of discharge)).

[25]*In re Calder*, 907 F.2d at 955.

[26]*Bensenville Community Center Union v. Bailey* (*In re Bailey*), 147 B.R. 157, 165 (Bankr. N. D. Ill. 1992); 6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

14

omission prevents the trustee or a creditor from fully examining the debtor's pre-bankruptcy financial dealings.[27]

The Court finds that the UST has shown by the requisite preponderance of the evidence that Debtor's discharge should be denied in this case. Debtor has admitted, or at least not contested, the fact that he made numerous false statements in connection with this case. The false statements in his schedules and SOFA include:

1) his failure to disclose substantial gambling income and losses. For example, in 2005 Debtor had a net loss at three Harrah's casinos around the country in excess of $70,000, and testified at trial that the losses were likely much higher than that since he also gambled, and lost, at non-Harrah's casinos where his gaming activity was not tracked by a player card;

2) the failure to disclose the existence of a bank account at Kaw Valley State Bank, which was one of the two financial accounts that was primarily used to handle the numerous cash advances;

3) the failure to disclose the existence of the bank account at Kansas Super Chief Credit Union, as well as a Certificate of Deposit account, again, through which the cash advances were handled. Both the Kaw Valley and Kansas Super Chief Credit Union accounts were either open at the time of the bankruptcy or had been closed within one year of the filing. These accounts had substantial amounts of money in them at various times within one year of the filing of this case;

4) failure to disclose (in response to Question 10) numerous transfers of property, not in the ordinary course of business or financial affairs of Debtor, within the year prior to bankruptcy. These include the transfers to pay for the patio and driveway, and the numerous transfers from Kaw Valley State Bank and Kansas Super Chief Credit Union to repay the equity line of credit against his home, and

---

[27]6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

5) at Debtor's 341 meeting he clearly and unequivocally testified that the information contained in the schedules and SOFA was based upon his personal knowledge and that he had personally reviewed the documents prior to signing them. At trial, Debtor equally unequivocally testified that his wife actually completed the SOFA without his input and he simply signed the forms without ever reviewing them for accuracy.

The Court finds that uncontroverted evidence exists that Debtor made numerous false statements under oath in this case.

The next issue the Court must decide is whether Debtor knew the statements were false when made, and whether they were made with the intent to defraud. As previously stated, intent may be inferred, and reckless indifference to the truth may rise to the level of fraudulent intent.[28] Debtor claims that the false statements were merely the result of lapses in memory or confusion, based on his age. Again, judging Debtor's rather selective memory and demeanor at trial, the Court finds that the statements were made, at the very least, with reckless indifference, and more likely than not intentionally and with the intent to defraud.

The most glaring example of this is Debtor's failure to disclose his gambling losses on his SOFA. Question 8 on that form requires the Debtor to "List all losses from fire, theft, other casualty or *gambling* within **one year** immediately preceding the commencement of this case **or since the commencement of this case**."[29] This question very clearly requires debtors to list any gambling losses within one year of the commencement of this case, so the

---

[28] 6 Collier on Bankruptcy ¶ 727.04[1][a], 727-40 (15th rev. ed. 2001).

[29] SOFA (bolded emphasis in original; italics emphasis added).

Court finds that Debtor simply could not have been confused by what he was required to disclose.

Further evidence that this omission was intentional can be seen in a review of trial Exhibit 4, which shows Debtor's signature on several IRS Form W-2Gs (Gambling Winnings), with dates less than four months prior to filing bankruptcy. In addition, Debtor's income tax return for tax year 2004 was admitted at trial, and shows that within five months of filing bankruptcy, he had signed a tax return reflecting $11,982 of gambling winnings. In addition, Exhibit 9 at trial was an amended 1040X for the year 2003, which he signed on or after July 30, 2005 (the date of the preparer's signature), which was amended for the sole purpose of properly reporting "gambling winnings and gambling losses incorrectly stated on original return." Given the extent of the losses that Debtor suffered on an ongoing basis, the fact he was traveling to casinos in several states throughout the year to gamble,[30] the fact he had very recently been reminded of his gambling losses by signing tax returns reflecting gambling transaction, and the fact he had signed several W-2Gs within a short time before filing bankruptcy, the Court simply does not believe that this Debtor could have simply forgotten about his gambling wins and losses.

This is not a case of a debtor who made an occasional trip to a casino, lost an insignificant amount of money and then simply neglected to report it on his SOFA. In 2005, Debtor's losses were more than twice the amount of his total annual income disclosed on his

---

[30]Exhibits 7 and 8 show that Debtor had gambled in various Harrah's casinos located in the following states in 2004: Kansas, Nevada (Lake Tahoe, Las Vegas, and Laughlin), California and Tennessee.

17

Schedule I. Gambling was a significant part of Debtor's life when he signed the schedules and statement of affairs under oath—or had been within the very recent past, and he does not escape scrutiny by now claiming he did not read the schedules and statement clearly enough (or at all) to see its unambiguous reference to an activity that appears to have consumed his life in the year or two prior to filing bankruptcy.[31]

Similarly, the Court finds Debtor's failure to disclose the existence of the Kaw Valley and Kansas Super Chief Credit Union accounts was neither unintentional nor the result of inadvertence or confusion. This bankruptcy case was filed on September 26, 2005. Debtor received his final account statement for the Kaw Valley account on or about June 22, 2005--- only three months prior to the filing of this case. Had the amount of time that had elapsed between the closing of the account and the filing of the case been substantially longer, the Court might be able to believe the failure to disclose the Kaw Valley account was unintentional. Furthermore, it must be remembered that this was not an account that sat idle for an extended period of time with little or no activity prior to bankruptcy. The evidence presented at trial shows that Debtor was depositing and withdrawing thousands of dollars from and into that Kaw Valley account as recently as seven months prior to his filing bankruptcy—most of it from credit card advances.

---

[31]Debtor also failed to list any income from gambling on his SOFA, which is also required. However, because Debtor actually had net losses from gambling, and because many lay people incorrectly believe that monies won gambling need not be included in "income," especially when losses exceed wins, the Court does not consider this fact, alone, a basis for a denial of discharge under § 727(a)(4)(A).

18

The activity in the undisclosed Kansas Super Chief Credit Union account was even more substantial than in the undisclosed Kaw Valley account. He withdrew over $30,000 from that account within one year of the bankruptcy filing—substantial money for a man whose total monthly income is $651 from Social Security. Furthermore, this account was closed within six months of the bankruptcy filing. The Court simply did not find Debtor's testimony credible either that he that he had forgotten about the account, or that he did not read the schedules and did not realize this account was omitted.

The Court thought it significant that Debtor never testified that he had medical problems that created a memory loss. He did testify that he had had health problems his whole life, but that they were no worse or better now than they had been. He testified he was not taking medication that would impair his memory, and at his deposition—when he swore he had read and signed his SOFA, testified there was no reason why he could not fully tell the truth. Significantly, no one testified on his behalf (a family member, a physician, or anyone else) about any memory problems (or anything else). Although it is not his burden to prove that he did not intentionally omit all this information from his schedules, once the Trustee had demonstrated how unlikely the "I forgot" excuse was to be true, one would have thought Debtor would have tried to rebut the damning evidence. He did nothing to help his cause.

Finally, the Court finds particularly troubling Debtor's testimony regarding his review and signing of his schedules and SOFA. Debtor signed both of these forms immediately below these printed statements: "I declare under penalty of perjury that the information

19

provided in this petition is true and correct," and "I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct." At his § 341 meeting, which was tape-recorded, he specifically and unequivocally testified that he read all the documents before signing them, that the information was based on his own personal knowledge and that there were no corrections that should be made.

At trial, however, he had apparently decided things might go better for him if he now said he had in essence been duped into signing schedules and statements that had been completed by his wife, which he claimed he had not bothered to ever read. Although the Court frankly did not believe this testimony, there is no question that if Debtor's testimony at trial on this matter is correct, and he did not complete the forms himself (or even review them before signing), that he was also well aware of this information at the time of his § 341 first meeting. He nevertheless chose to testify, under oath at that proceeding, that he <u>had</u> read and signed the information, and that no information contained therein was incorrect. That hearing was conducted only a few weeks after he had signed the documents, when this fact would have been fresh in his mind. His failure to tell the truth at that proceeding—assuming his testimony at trial is true, was obviously meant to intentionally mislead the Trustee at that time.

And if his testimony at the § 341 was correct, then Debtor intentionally mislead the Court at the trial in this matter, as both sets of testimony cannot be true. In either event, it is clear to the Court that Debtor intentionally made at least one false statement under oath in connection with this case.

20

The Court should also note that it views Debtor's testimony, and actions in the case, through the prism of his early lack of cooperation with the Trustee in assisting her to obtain the documents she needed to investigate his financial affairs—an investigation made necessary by his false and incomplete SOFA.  After the Trustee made it obvious at the meeting of creditors that she was dissatisfied–or at least curious about, his answers, schedules and SOFA, and requested a series of documents, mostly from financial institutions and the credit card companies, Debtor was not immediately forthcoming with the information.  The Trustee was required to file a motion to compel[32] in order to obtain the documents, as well as a second motion to compel to obtain a copy of Debtor's 2005 tax return.[33]

In fact, when the credit card information was finally turned over, it was significantly incomplete in that only some of the requested months and some of the card holders' statements were supplied.  Such conduct tends to support the Court's overall impression that Debtor was not the kind of "honest but unfortunate debtor"[34] that deserves a discharge, or who deserves to walk away from debt that was accumulated at least in part to aggrandize the value of the property he hoped to keep from his creditors.

The final issue for the Court to consider is whether these false statements were material to the case.  A false oath is "material" if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the

---

[32]Doc. 5.

[33]Doc. 21.

[34]*Grogan v Garner*, 498 U.S. 279, 279 (1991).

21

existence and disposition of property.[35] In this case, Debtor's concealment of his extensive gambling activity, his concealment of the two bank accounts through which thousands of dollars passed within a year of bankruptcy, his concealment of the transfers made to increase the value of his home (patio and driveway) , as well as the failure to disclose the transfers to Capital Federal to enable him to pay off the home equity account through the use of these cash advances, directly relate to the existence and disposition of Debtor's property.  Without having such full and accurate disclosure of this type of information, it is exceedingly difficult for trustees and creditors to have a complete picture of a debtor's financial dealings leading up to the point of the bankruptcy filing.

The Court finds that it is no coincidence that Debtor elected not to reveal the existence of the two recently closed financial accounts.  In retrospect, all the information Debtor elected to omit on his SOFA had one central theme.  He failed to disclose transfers that he had made within the requisite period that had the result of increasing the value of his home at the expense of the credit card creditors.  He failed to disclose the very bank accounts where those transfers were "laundered."  He failed to disclose the financial account where the line of credit was paid off with the credit card advances.  He failed to disclose the gambling, which may well have been the original reason for Debtor opening the line of credit.  If he told the truth in response to Questions 10 or 11, the whole plan would easily

---

[35]*In re Calder*, 907 F.2d at 955.

unravel and the Trustee would be easily able to discover the scheme. So he elected to tell the truth on none of them.

The Court also finds that Debtor's false statements about his review of his SOFA before signing it and about the information being based on his own personal knowledge, which statements are simply perjurious, is also material to this bankruptcy. One of the main purposes of the § 341 meeting is to allow the trustee the opportunity to ensure that the debtor personally provided the information for his or her schedules and SOFA and that the information was provided to the best of the debtor's ability and knowledge. When a debtor, such as William Keck here, lies to the Trustee about the source of the information in the schedules and only confesses the truth when faced with the prospect of having his discharge denied based upon the patently false information contained in those schedules, the integrity of the entire bankruptcy process is jeopardized.

Section 727(a)(4)(A) is specifically aimed at preventing debtors who knowingly and intentionally provide false information under oath from receiving a discharge. The Court finds the UST has easily met her burden of showing that Debtor, William Keck, should be denied his discharge pursuant to § 727(a)(4)(A).

### 3. The UST's § 727(a)(5) claim

The UST also claims that Debtor's discharge should be denied based upon § 727(a)(5). In order to prevail on that claim, the trustee must show that the debtor "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph,

23

any loss of assets or deficiency of assets to meet the debtor's liabilities."[36]  "The objecting creditor, here the [UST], bears the initial burden of showing that the debtor, at a time not remote in time to the filing of the bankruptcy, had assets that would have belonged to the bankruptcy estate but did not possess those assets as of the petition date.  Once the trustee makes this showing, the burden then shifts to the debtor to satisfactorily explain the loss or deficiency in assets."[37]

Unlike §§ 727(a)(2) and (a)(4), a creditor or trustee does not have to show fraudulent intent to succeed on a claim under § 727(a)(5).[38]  "A cause of action advanced under § 727(a)(5) is not a substitute for one based upon alleged prepetition fraud, conversion or other malfeasance.  Rather, its purpose is to deny a discharge to a debtor who refuses to cooperate with the trustee or creditors in their effort to trace property that should have been part of the estate."[39]

The Court finds that the UST has also met her burden of showing that Debtor possessed property that would have belonged to the estate a relatively short time before the filing of the bankruptcy petition, but did not possess those assets at the time of the filing. The Court also finds, however, that Debtor has ultimately met his burden of explaining what happened to those assets, which amounted to cash obtained from his credit cards.  The

---

[36]11 U.S.C. § 727(a)(5).

[37]*In re Shepherd*, 2005 WL 4147868 (Bankr. D. Kan. 2005) (citing *In re Straub*, 192 B.R. 522, 525 (Bankr. D.N.D. 1996)).

[38]*In re Carlson*, ___ B.R. ___, 2006 WL 3391508 (10th Cir. BAP Nov. 22, 2006).

[39]*In re Straub,* 192 B.R. at 525.

24

evidence establishes that the cash advances that were the subject of the trial that were taken by Debtor within a year of bankruptcy were used for two purposes: 1) to pay the home equity line of credit secured by a mortgage on Debtor's homestead; and 2) to enable Debtor to gamble extensively.[40]

Both of these uses were documented at trial. Debtor's testimony at trial, combined with the tax statements from Harrah's casino and his income tax returns, clearly show the extent of Debtor's gambling problem. His bank records show the use of the funds to retire the line of credit on Debtor's homestead, and to add improvements to that homestead.

Although the Debtor was not exactly forthcoming about the use of the funds for gambling, he did finally admit to his gambling transactions during his deposition, portions of which were admitted at trial upon the parties' stipulation, and at trial. Section 727(a)(5) clearly indicates that a debtor is only required to account for the losses of his assets before the determination of dischargeability has been made. The Court finds the Debtor has, finally, done so in this case. For that reason, discharge is not denied under § 727(a)(5).

**B.    Objection to homestead exemption**

The second issue before the Court is the Trustee's objection to at least a part of Debtor's homestead exemption on the basis that he used cash advances from his credit cards to pay off his mortgage, with the intent to convert a secured debt (the debt owed to Capital

---

[40]Although there was no direct evidence of this, the cash advances may well also have been used to pay other living expenses, because Debtor's schedules, again, reflect no debt, to anyone, other than the credit cards, and Debtor revealed no source of income other than a very small Social Security payment. Again, his schedules reflected no medical debt, no utility debt, no property tax debt, no income tax debt–nothing like the Court routinely sees on schedules where debtors have also accumulated significant credit card debt.

Case 05-43269    Doc# 46    Filed 03/02/07    Page 25 of 35

Federal on the home equity account) into an unsecured debt (owed to various credit card companies). The Trustee contends that this action constitutes "excessive and inappropriate bankruptcy planning," and constitutes just cause for imposing an "equitable lien" against Debtor's homestead for the benefit of the estate.[41]  Debtor argues his actions constitute permissible bankruptcy estate planning, and that he did not have the requisite intent to hinder, delay or defraud creditors.

Congress made sweeping changes to the Bankruptcy Code in 2005 with the April 20, 2005 passage BAPCPA. Although most of the provisions of the BAPCPA did not take effect for 180 days after its passage, some changes became immediately effective upon passage. Included in those provisions that became immediately effective were new limitations on a debtor's homestead exemption for fraud.[42]  Because Debtor's bankruptcy was filed on September 26, 2005, those changes limiting a debtor's homestead exemption are applicable here.

Section 522(o)(4) provides, in pertinent part, that

> Under the Bankruptcy Code as amended by BAPCPA, the value of an interest in real or personal property that the debtor or a dependant of the debtor claims as a homestead shall be reduced to the extent that any such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, defraud, or delay a creditor and that the debtor could not exempt, . . . if on such date the debtor had held such property so disposed of.

---

[41]Doc. 7 (Trustee's Objection to Debtor's Exemption).

[42]Section 1501(b)(2) of BAPCPA, Public Law 109-8, 119 Stat. 23 provides that changes made by § Sec. 308, which deals with limitations on the debtor's homestead due to fraud, are effective immediately.

Case 05-43269   Doc# 46   Filed 03/02/07   Page 26 of 35

To succeed in an attempt to limit a homestead exemption[43] under § 522(o)(4), the Trustee must show (1) that the debtor disposed of property within the 10 years preceding the filing of the bankruptcy petition, (2) that the proceeds from such disposition were used to increase the value of the debtor's homestead, (3) that the property disposed of was not itself exempt, and (4) that in doing so, the Debtor acted with the intent to hinder, delay or defraud a creditor.

As a preliminary matter, this Court agrees with those courts who have held that an actual intent to defraud, similar to what is required under § 727(a)(2)(A), must be shown before § 522(o) will apply.[44]  While § 727(a)(2)(A) allows a Court to deny a debtor's discharge for fraudulent conduct, § 522(o) goes one step further by providing the trustee the ability to recoup the property that was fraudulently transferred for the benefit of the estate, similar to the powers the trustee has to avoid preferential or fraudulent transfers under §§ 547 or 548.

---

[43]Kansas is an opt-out state, which means that debtors' homestead exemptions are determined by state law, subject to applicable Bankruptcy Code limitations.  K.S.A. 60-2301 provides: "A homestead to the extent of 160 acres of farming land ... occupied as a residence by the owner or by the family of the owner, or by both the owner and the family thereof, together with all improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; but no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of said premises, or for the erection of improvements thereon."  *Also see* Kan. Const. art. 15, § 9.

[44]*See In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006) (where Judge Somers distinguished facts in his case from our fact pattern, where a debtor obtains loans from credit card advances to pay down debt that impairs an exemption); *In re Lacounte*, 342 B.R. 809, 814 (Bankr. D. Mont. 2005) (reducing debtor's homestead exemption by $42,500 based on abusive pre-bankruptcy planning in violation of § 522(o), and denying confirmation of Chapter 13 plan for failing to satisfy "best interest of creditors" test); and *In re Maronde*, 332 B.R. 593, 599 (Bankr. D. Minn. 2005) (denying confirmation of Chapter 13, for debtor's failure to satisfy "good faith" confirmation requirement and "best interests of creditors" test, and holding that statutory language "with actual intent to hinder, delay, or defraud" can be found in § 727(a)(2)(A), and that similar words within one statutory body of legislation should, where reasonable, be interpreted with the same meaning.  Also holding that cases regarding exemption planning, and cases deciding when it is that a "pig becomes a hog," will likely "retain their currency" when interpreting § 522(o)).

The Court has already found that Debtor methodically used large cash advances taken from various credit card companies to both make improvements on, and to eliminate the secured debt against, his homestead.[45] Clearly, the cash received from such cash advances was not exempt property. Finally, the Court has already made findings of fact that Debtor's actions in using the cash advances to pay off his mortgage and increase the value of his homestead were done with the intent to hinder, delay or defraud his creditors under the UST's § 727(a)(2)(A) claim, and incorporates that same reasoning here.

This is not a case where a debtor simply converted non-exempt property he already owned to exempt property in anticipation of filing for bankruptcy, as part of legitimate bankruptcy estate planning clearly allowed in this Circuit.[46] Instead, this Debtor purposely incurred substantial debt on his unsecured credit cards in order to obtain the non-exempt property, which he then converted to his homestead—in other words, this Debtor borrowed unsecured cash to "create" equity, not to preserve assets he already owned. The Court finds that the Trustee has met her burden of showing that Debtor's homestead exemption should be reduced, pursuant to § 522(o).

---

[45]Again, his schedules show zero debt to anyone EXCEPT credit card debt. He listed seven different credit card companies, with seven different account numbers, with debt totaling $66,140. Again, this debt was apparently all acquired at a time when his total monthly household income was $1,341, all from Social Security, as he and his wife were retired. This Court can only wonder why so much credit was available for someone with such limited, and fixed, income.

[46]*In re Carey*, 938 F.2d at 1077 (holding that Carey's pre-bankruptcy planning was consistent with what has been approved by Congress to take advantage of exemptions, was done out in the open over a two year period prior to filing, and that all payments and transfers were fully disclosed in her bankruptcy schedules and at the meeting of creditors).

28

Although the Court finds that § 522(o)(4) is applicable, the record is not entirely clear as to the precise amount of cash advances Debtor used to pay off the line of credit against his home and to make other improvements, versus the amount that was used merely to satisfy Debtor's gambling habit or pay other living expenses. Although determining the exact amount of money Debtor used from his cash advances to pay his home mortgage was unnecessary in the context of deciding whether his discharge should be denied under § 727(a)(2)(A), it is necessary to determine the extent of the value of his homestead that he fraudulently acquired for the § 522(o)(4) analysis.

As the party objecting to Debtor's homestead exemption, the Trustee bears the burden of proving the extent to which the value of Debtor's homestead was increased by the use of cash advances from his credit cards.[47] The testimony on this matter was not as clear, but the Court has reviewed several exhibits to help determine on which amounts the Trustee has been able to sustain her burden of proof.

The Trustee clearly demonstrated that Debtor used two specific cash advances to increase the value of his homestead. First, on March 24, 2005 Debtor used a cash advance "convenience check" from Discover Bank to pay for a new driveway at his home. On the "memo" line on the bottom left of that check is handwritten the word "driveway," and Debtor admits some of the money obtained from this check was used for that purpose. Although the check was written for $5,878.61, and Debtor did not supply any receipts from the vendor

---

[47] *See Jenkins v. Hodes (In re Hodes)*, 402 F.3d 1005, 1011 (10th Cir. 2005) (holding that the objecting party has the burden of proof on an objection to a claimed exemption and must show that the exemption was improper by a preponderance of the evidence). *See also* Fed. R. Bankr. P. 4003(c).

29

who installed the driveway, Debtor testified at trial that the actual cost of the driveway was an even $3,000 and that he used the remainder to gamble. Frankly, this testimony is simply not believable. If Debtor intended to write a check in excess of the cost of the driveway, why would he take such an odd amount------$2,878.61, resulting in loose change, to the casino? The Court finds that the $5,878.61 should be recovered by the estate.

Secondly, on April 13, 2005, Debtor used another cash advance check to have a new patio installed at his home. This check was written for $5,680, and again, the "memo" line indicated that purpose. Debtor testified that the actual cost of the patio was $4,885 and that he used the remainder of the money to gamble.[48] The Court again finds that the check, itself, is the most reliable evidence of the actual amount of this home improvement. First, Defendant is not a credible witness, and secondly, it simply makes no sense to write a check for $5680 when the actual cost was $4885—leaving a $795 overage. This story might have been more believable if the overage had been in even increments of $100. The Court finds that $5,680 should also be recovered against the homestead.

Upon reviewing the various bank statements and credit card statements admitted into evidence, the Court also finds that the use of an additional $4,414.18 can be directly traced

---

[48]The Court finds the precision of Debtor's memory of the exact cost of the patio and driveway to be rather remarkable, given his testimony that he could not remember other far more relevant information relating to this case when asked by the UST or the Trustee at trial. For example, Debtor, who admittedly gambles regularly, could not roughly recall the last time he gambled in the sixteen days prior to the trial, but could remember the exact cost of a patio that was installed at his house nearly two years earlier. Another example is that during his first meeting of creditors, he recalled the exact date he purchased his home. Finally, his credibility was impaired by numerous disingenuous responses to the Trustees' questions during trial. When presented with a copy of the $8200 convenience check that clearly showed its origin was MBNA, and then clearly presented with evidence that that exact amount was deposited in his Kaw Valley account the very next day, he persisted in testifying that the Kaw Valley deposit might have derived from his gambling winnings. These are but three of the many examples of testimony that caused the Court to discount Mr. Keck's overall credibility.

30

from a cash advance to pay the cash equity loan against the home.  On January 23, 2005, the balance in Debtor's Kaw Valley bank account was $1,085.82.  The next day, on January 24, 2005, Debtor deposited an $8,200 cash advance check from his MBNA credit card into the Kaw Valley account.  On February 24, 2005, Debtor withdrew $5,500 from his Kaw Valley account and made a payment on his home equity line of credit in the exact amount, only one day later.  The Court has no doubt the $5,500 used to make the payment on the line of credit on February 25, 2005 came from the $5,500 withdrawn from the Kaw Valley account on February 24, 2005.  Because there were no additional deposits made into the Kaw Valley account between January 23, 2005 and February 24, 2005, a minimum of $4,414.18 from the cash advance check from MBNA was used to pay down the line of credit.

The remaining transactions do not provide as clear a link between the cash advances Debtor took from his credit cards and payments toward his homestead.  It is certainly clear that Debtor was taking very large and frequent cash advances from his credit cards, but he was also taking some large advances from the home equity line of credit during the relevant period, as well.  Based upon the exhibits admitted at trial, Debtor took approximately $27,200 worth of cash advances on his credit cards, other than those accounted for in the preceding paragraph, from July 2004 through the March or April of 2005.  Over that same period of time, Debtor took approximately $36,675 worth of cash advances against his home equity line of credit, which was secured by his homestead.  In that time period, he made just over $51,000 worth of payments on that same line of credit, in addition to his normal

31

monthly payments, which ranged from approximately $200 to $300 based on a fluctuating interest rate.

The Court is simply unable to discern from reviewing the bank statements and credit card statements precisely where the $51,000 worth of payments came from. Although it is certainly possible, if not likely, that at least some of those payments are directly traceable to Debtor's cash advances from his credit cards, it is also possible that the payments came from money left over from gambling stakes derived from the cash advances from the line of credit.

Because the Court cannot determine, except as previously set forth above, the exact amount Debtor increased the value of his homestead from his credit card cash advances, the Court finds the Trustee's objection must be overruled to extent it seeks to reduce the value of the Debtor's homestead beyond $15,972.79. The Court will sustain the objection to the homestead in the amount of $15,972.79, which includes the entire amounts paid for the patio and driveway, plus the $4,414.18 that is directly traceable from a credit card cash advance to a payment on the line of credit secured by Debtor's homestead.

## III.   CONCLUSION

The Court is convinced that at some point, probably six to 12 months prior to filing, Debtor realized that he would be unable to continue to fund his gambling habit and keep his home. Circumstantial evidence indicates he would pay enough on his credit cards that the card companies would allow him to continue to receive cash advances. Circumstantial evidence also shows that when he finally got his home equity line of credit paid, he stopped paying on those credit cards, and a few months later filed bankruptcy. He nevertheless

managed to pay every other debt as it came due----including real estate taxes, home insurance, medical bills, utility bills and the like.

It certainly appears that Debtor had a methodical plan to free his home of any encumbrances so the full value could be protected from those credit card companies' collection efforts. Evidence showed no "trigger" for this bankruptcy—no foreclosure, repossession, lawsuit, or garnishment. There was no reason he could not continue to make the $200-$300 monthly payment on his equity line of credit, if he really believed—as he testified—that the next gambling winning was right around the corner.

Instead of doing that, he methodically took large and frequent cash advances from several different credit card companies (which allowed him to take more advances, over a longer period of time) to fund his desire to gamble. This conduct, by itself, might not have resulted in this outcome, but when he used those advances to ultimately pay off the home equity loan on his home and to even increase the equity in that exempt home through the use of cash advances for a driveway and patio, the equation changed.

This was done at a time when there was no reasonable way his monthly income (or gambling income—in light of the history of losing more in gambling than he won) could retire the debt he was accumulating. Debtor articulated that he thought he could gamble his way out of the debt, but the timing of the advances, and the choices he made in terms of deciding who to pay when he did not win at the tables, demonstrate his true intent. Towards the end, when he had leftover funds from these cash advances, those funds were not used to

33

repay the ever-increasing credit card debt. Instead, the money went to enhance the home that he thought he could protect from creditors.

Ultimately, this Court simply did not believe Debtor's testimony that he did not have the requisite intent to hinder, delay or defraud his creditors. By opting not to tell the truth either at trial or during his first meeting of creditors, or both, and by including blatantly incorrect answers on his SOFA, under oath, and then failing to correct them by filing amended schedules when those errors were brought to his attention by the Trustee, Debtor admittedly did not help his cause on any issue.

Based on the foregoing discussion, the Court finds that Debtor's discharge should be denied pursuant to §§ 727(a)(2)(A) and (a)(4)(A). The Court finds that Debtor transferred property of the estate within one year of bankruptcy with the intent to hinder, delay or defraud creditors, and made material false statements under oath in connection with his bankruptcy case. The Court further finds that because Debtor transformed non-exempt assets into exempt assets with the requisite intent, his homestead exemption is reduced by $15,972.79, the Trustee's objection is sustained in that amount, and the estate is granted an equitable lien against his home in that amount.

**IT IS, THEREFORE, BY THIS COURT ORDERED** that the Debtor, William Jack Keck, is denied a discharge in Case No. 05-43269 pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A), but that the Court overrules the United States Trustee's request that his discharge also be denied under § 727(a)(5).

34

**IT IS FURTHER ORDERED** that the Trustee's objection to Debtor's homestead exemption is sustained in the amount of $15,972.79. Debtor's homestead exemption is reduced by $15,972.79, pursuant to 11 U.S.C. § 522(o)(4), and the Court grants the estate an equitable lien against the real property located at 2010 SW James Street, Topeka, Kansas.

**IT IS FURTHER ORDERED** that the foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Fed. R. Bankr. P. 9021 and Fed. R. Civ. P. 58.

# # #